IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RAHEEN BRITTINGHAM, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil No. 07-190 (JBS/AMD) |
| CITY OF CAMDEN, et al., | **OPINION** |
| Defendants. | |

APPEARANCES:

Michael D. Pomerantz, Esq.
LAW OFFICES OF JOSEPH M. MARRONE
1525 Locust Street, 12th Floor
Philadelphia, PA 19102
     Attorney for Plaintiff

John C. Connell, Esq.
John P. Kahn, Esq.
Maureen T. Coghlan, Esq.
ARCHER & GREINER, P.C.
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033-0968
     Attorneys for the Defendants

**SIMANDLE**, District Judge:

# I.    INTRODUCTION

This matter is before the Court upon Defendants' motion for summary judgement [Docket Item 57].  This case arises out of an incident which took place on August 8, 2006, in which Plaintiff Raheen Brittingham[1] was shot in the shoulder by Camden County

---

[1]  The Complaint identifies Plaintiff as "Raheen Brittingham," but Plaintiff's recent submissions refer to him as "Raheem Brittingham."  If the caption in this case is incorrect, Plaintiff should seek to amend the caption accordingly.

Prosecutor's Office Investigator Brian DeCosmo.  Plaintiff alleges that the shooting constituted an unreasonable seizure which violated his rights under the Fourth and Fourteenth Amendments of the United States Constitution.  Plaintiff brought suit against Mr. DeCosmo, the Camden County Prosecutor's Office ("CCPO"), and various governmental entities, asserting claims pursuant to 42 U.S.C. § 1983 and New Jersey common law.

The principal issue to be decided is whether Officer DeCosmo is entitled to qualified immunity for the force used upon Plaintiff on the evening of August 8, 2006, or whether the evidence, when viewed in the light most favorable to Plaintiff, reveals a material dispute of fact concerning the reasonableness of Officer DeCosmo's use of force.  For the reasons set forth below, the Court finds that such factual disputes exist in this case, and will grant in part and deny in part Defendants' motion for summary judgment.

## II.  BACKGROUND

### A.  Facts

#### 1.  <u>Undisputed Facts Leading up to the Shooting</u>

On the evening of April 8, 2006, police officers from the Camden Police Department responded to a series of 911 phone calls indicating that a riot and several fights were occurring between groups of adolescent girls around Tenth Street in Camden, New Jersey.  (Connell Cert. Ex. 8 at 290-294.)  Defendant DeCosmo of

2

the Camden County Prosecutor's Office and Officer John Kemp of
the Camden Police Department were on patrol that evening and
responded to the 911 calls in a marked police car at
approximately 10:45 p.m.  (DeCosmo Dep. at 54.)  Officers DeCosmo
and Kemp were both assigned to the Camden County Domestic
Violence Task Force and were functioning as partners during all
relevant times during the evening in question.  (Connell Cert.
Ex. 8 at 40.)  Defendant DeCosmo observed "[a] large fight
consisting mostly of teenagers, many females" and estimated that
approximately one hundred individuals were involved.  (DeCosmo
Dep. at 56.)  The crowd of individuals began to disperse and
cease fighting once the police authorities arrived, but kept re-
forming in smaller groups in a three or four block radius around
the area.  (Connell Cert. Ex. 8 at 45.)

At 10:58 p.m., a 911 call was placed indicating that a
disturbance was taking place at nearby 2058 Kossuth Street, in
which the 911 operator was advised by the female caller that
"they have guns and knives."  (Id. at 81.)  Defendant DeCosmo and
Officer Kemp, along with other officers, reported to the scene,
but found the area to be clear.  (DeCosmo Dep. at 59.)  Several
additional 911 calls placed around that time indicated that, by
approximately 11:05 p.m., one of the disturbances had moved to

Phillip Street.[2]  (Connell Cert. Ex. 8 at 290.)

        2.   <u>Plaintiff's Account of the Shooting</u>

     According to Plaintiff, on the evening of August 8, 2006, he was returning from his girlfriend's house to a relative's residence near Phillip Street.  (R. Brittingham Dep. at 40.) Upon his approach, he encountered his fifteen-year-old sister, Derenda Brittingham, and a group of girls yelling at another group of girls.  (<u>Id.</u> at 42-43.)  At the scene of this dispute, Plaintiff observed a gold minivan; inside the minivan was Bridgette Owens Parker, the mother of thirteen-year-old Nidjha Owens, who was one of the girls at whom Derenda Brittingham was yelling.  (<u>Id.</u> at 45-46.)

     Plaintiff approached the minivan and spoke with Ms. Parker. In order to break up the fight, Plaintiff suggested to Ms. Parker that she gather Nidjha and Nidjha's friends and leave, and that Plaintiff would take his sister Derenda away.  (<u>Id.</u> at 46-47.) Ms. Parker agreed with Plaintiff's plan.  (<u>Id.</u>)  According to Plaintiff, "she grabbed her peoples; I grabbed my peoples and . .

---

    [2]  Unidentified 911 callers indicated that "there's a whole bunch of girls fighting on Chelton and Phillips."  (Connell Cert. Ex. 8 at 290.)  A second call reported, "You better get some cops on Phillips Street[;] they got a riot going on."  (<u>Id.</u> at 291.) Further calls reported that "they're fighting on 10[th] Street again," (<u>id.</u> at 292); "[y]ou got to hurry up lady, hurry up right now just passed Kossuth Street we just had a big fight out of, out of, they got guns, razors or whatever," (<u>id.</u> at 293); "I was just calling there's a whole bunch of girls fighting on Chelton and . . . Phillips Street right off Ferry Avenue."  (<u>Id.</u> at 294.)

. everything was over." (Id. at 47.)  Derenda departed the scene
and went across the street to her friend Charlene Vaughn's house,
which is located at 1950 Phillip Street.  (D. Brittingham Dep. at
27.)  Plaintiff's account of these events is consistent with the
testimony of Ms. Parker, who recalled gathering her family in her
van as Plaintiff sent his sister away from the scene.  (Parker
Dep. at 24-25.)

        According to Plaintiff, after he and Ms. Parker had broken
up the fight, two police vehicles arrived on the scene.  (R.
Brittingham Dep. at 54.)  One of the police vehicles drove by
Plaintiff and shined a light upon him as it passed.  (Id. at 57.)
After both police cars came to a stop, Plaintiff walked between
the vehicles toward 1950 Phillip Street, the house which Derenda
had just entered, in order to speak with his sister about the
events of that evening.  (Id. at 59, 69.)  According to
Plaintiff, none of the officers in either police car said
anything to him as he walked to the house.  (Id. at 61.)
Plaintiff reached the house, walked through the "wide open" front
door, (id. at 70), closed the door behind him, and walked a short
distance in the apartment from the front door to the kitchen in
order to get a glass of water.  (Id. at 73-74, 94.)  Derenda
Brittingham and several other women were in the house when
Plaintiff entered.  (D. Brittingham Dep. at 40.)

        According to Plaintiff's evidence, once he reached the

kitchen, the front door was "kicked open," and, according to Plaintiff, Defendant DeCosmo immediately shot Plaintiff in the shoulder.  (R. Brittingham Dep. at 74; D. Brittingham Dep. at 40.)  According to Plaintiff, Officer DeCosmo gave no warning, did not "yell any commands" or "say freeze" upon entering the apartment, but instead burst through the door and shot Plaintiff almost instantaneously.  (R. Brittingham Dep. at 95-96.)  Plaintiff collapsed to the floor, (id. at 100), at which point Derenda, who had witnessed the shooting from the living room couch, ran to him and told Officer DeCosmo not to shoot Plaintiff again.  (D. Brittingham Dep. at 40.)  Officer DeCosmo and Derenda brought Plaintiff to the living room couch, on which he laid until the ambulance arrived.  (Id. at 100.)  Plaintiff's version of the events, in which Officer DeCosmo burst through the door and immediately shot Plaintiff without issuing a warning, is corroborated by the testimony of Derenda Brittingham and Amirah Cotton, both of whom witnessed the shooting and testified to a similar series of events at their respective depositions.  (D. Brittingham Dep. at 40; A. Cotton Dep. at 33-36.)

      3.   <u>Defendants' Account of the Shooting</u>

Defendants' account of these events differs markedly from Plaintiff's.  According to Officer DeCosmo, upon the officers' arrival at the intersection of Phillip Street and Jefferson Street, they observed a black woman standing outside of a brown

minivan.  (DeCosmo Dep. at 60; Connell Cert. Ex. 8 at 115.)
Officers DeCosmo and Kemp approached the woman, who stated to the
officers that a black man in a dark coat with fur on the hood had
just pointed a gun in her face and in her daughter's face.[3]
(DeCosmo Dep. at 60.)  According to the woman, the man with the
gun left, walking down Phillip Street.  (Id.)  Officers DeCosmo
and Kemp drove down Phillip Street in the direction the witness
had identified, and soon encountered an individual, Mr.
Brittingham, wearing a dark coat with a fur-lined collar whom
they believed matched the description given by the witness.  (Id.
at 61-62.)

    Officer DeCosmo pulled the police vehicle over approximately
forty feet from Plaintiff, and Officer Kemp pointed a light from
the police vehicle at Plaintiff.  (Id. at 62.)  Officer DeCosmo
exited the vehicle and said to Plaintiff, "police, let me see
your hands."  (Id. at 64.)  According to Defendants, Plaintiff
stopped, looked at the officers, reached into his waistband to
"ma[ke] an adjustment . . . [as if] to move an object," (such as

---

    [3]  As was noted, supra, Ms. Parker, who testified that
Plaintiff had assisted her in breaking up the fight between
Derenda Brittingham and Nidjha Owens, was on Phillip Street at
this time in a gold minivan.  (Parker Dep. at 24-25; R.
Brittingham Dep. at 45-46.)  At her deposition, however, Ms.
Parker testified that although she did speak with a tall police
officer that evening, she did not "give him a description of a
male that was at the scene."  (Parker Dep. at 28.)  In the motion
presently under consideration, Defendants do not assert that Ms.
Parker was the woman who told the officers about the man with the
gun, referring to the witness only as an unidentified woman.

a firearm, Defendants suggest), and then ran toward one of the apartments on Phillip Street.  (Id.; Connell Cert. Ex. 8 at 86.) Officer DeCosmo began to chase after Plaintiff, who reached the 1950 Phillip Street apartment, opened the door, entered, and slammed the door shut behind him.  (Connell Cert. Ex. 8 at 86.) Before the door was closed, Officer DeCosmo could see several women and children in the apartment's living room.  (Id.)

Officer DeCosmo "ran into the door without turning the knob," (id.), and, "through [his] momentum of going through the door, . . . ended up in the . . . living room of the apartment." (DeCosmo Dep. at 82.)  In the apartment, Officer DeCosmo observed Plaintiff through a "cutout wall" through which one could look into the kitchen from the living room.  (Id. at 83.)  According to Officer DeCosmo, Plaintiff appeared to be hiding and assuming a "combat position" in the kitchen.  (Id.)  Officer DeCosmo testified that he identified himself as a police officer and repeatedly ordered Plaintiff to raise his hands, which Plaintiff did not do.  (Id. at 89, 101.)  According to Officer DeCosmo, Plaintiff then came out from behind the pillar, at which point the officer saw "his arm and shoulder begin to raise from his waistband."[4]  (Id. at 105.)  Officer DeCosmo "fired one round, one shot hitting him in his right shoulder."  (Id.)

---

[4]  A witness to these events, Troina Moss, likewise testified that she observed Plaintiff "move[] his right arm" just prior to being shot.  (Moss. Dep. at 24.)

Officer Kemp could not see Plaintiff during this confrontation.  According to Officer Kemp's deposition testimony, he, with DeCosmo, yelled "police, police, show us your hands, show us your hands" at Plaintiff prior to Officer DeCosmo's pursuit.  (Kemp Dep. at 20.)  As DeCosmo chased after Plaintiff, Officer Kemp "lost a visual" on the two men.  (Id. at 25.) Officer Kemp then followed them to the apartment, where, from the doorway he could observe Plaintiff "moving back and forth" in the kitchen.  (Id. at 26.)  Officer Kemp testified that he and Officer DeCosmo repeatedly yelled "police" and "show us your hands."  (Id.)  At this point, however, some people from inside the apartment rushed out and knocked Officer Kemp down, after which he heard a shot fired.  (Id.)

After he was shot, Plaintiff was transferred to a couch in the living room, at which point Officer DeCosmo said, "I'm sorry that I had to shoot you . . ., but we got a report of a man, a person meeting your description that just pointed a gun in a lady's face and a little kid's face."  (DeCosmo Dep. at 119-20.) According to Defendants, Plaintiff responded by stating, "I had to, they were going to kill my sister."  (Id. at 120.)  In an investigation after the shooting, the police recovered a battery-operated cigarette lighter in the shape of a firearm from the kitchen; no actual firearm was found.  (Connell Cert. Ex. 8 at 124.)

9

**B.    Procedural History**

Plaintiff filed this Complaint on January 12, 2007, asserting claims premised upon the Fourth and Fourteenth Amendments to the United States Constitution, as well as upon New Jersey common law, against the City of Camden, the County of Camden, the Camden Police Department, the Camden County Prosecutor's Office, the State of New Jersey, and Officers Kemp and DeCosmo.  In its July 9, 2007 Opinion and Order [Docket Items 24 and 25], the Court granted the State's motion to dismiss all claims against it.  By stipulation of the parties [Docket Item 36], the claims against the City of Camden, the City of Camden Police Department, and Officer Kemp were dismissed on May 2, 2008.  Defendants thereafter filed the motion for summary judgment presently under consideration [Docket Item 57], to the merits of which the Court now turns.

**III. DISCUSSION**

**A.    Standard of Review**

Summary judgement is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed issue of material fact, a court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words,

10

"the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts."  Scott v. Harris, 550 U.S. 372, 378 (2007).  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.

**B.   Qualified Immunity**

The Court first addresses Defendant DeCosmo's argument that he is entitled to qualified immunity from Plaintiff's constitutional claims.  The Court explains the considerations that govern its review of the qualified immunity defense and applies such considerations to the instant matter in turn below.

1.   Qualified Immunity Standard

As an "accommodation of competing values," qualified immunity strikes a balance by permitting a plaintiff to recover for constitutional violations where a governmental defendant was "plainly incompetent or . . . knowingly violate[d] the law," while immunizing a state officer who "made a reasonable mistake about the legal constraints on his actions."  Curley v. Klem, 499 F.3d 199, 206-07 (3d Cir. 2007) (internal quotations and

citations omitted).

> The protection of qualified immunity applies regardless
> of whether the government official's error is "a mistake
> of law, a mistake of fact, or a mistake based on mixed
> questions of law and fact." Groh v. Ramirez, 540 U.S.
> 551, 567 (2004) (KENNEDY, J., dissenting) (citing Butz v.
> Economou, 438 U.S. 478, 507 (1978) (noting that qualified
> immunity covers "mere mistakes in judgment, whether the
> mistake is one of fact or one of law")).

Pearson v. Callahan, --- S. Ct. ----, 2009 WL 128768, at *6 (Jan.
21, 2009).

The Court's assessment of whether a defendant is entitled to
qualified immunity hinges on two considerations.[5]  The Court must
determine "whether the plaintiff has alleged a deprivation of a
constitutional right at all," id. (citation omitted), which, as
the Court of Appeals has emphasized, is not a question of
immunity as such, "but is instead the underlying question of
whether there is even a wrong to be addressed in an analysis of
immunity." Curley, 499 F.3d at 207.  In addition, the Court must
address "whether the right that was [allegedly] violated was

---

[5] While under Saucier v. Katz, 533 U.S. 194 (2001),
overruled in part by Pearson, 2009 WL 128768, at *10, the
qualified immunity analysis followed a "rigid order of battle,"
Pearson, 2009 WL 128768, at *8 (citation omitted), under which
the question of whether a right was clearly established was
assessed only if the plaintiff had adequately alleged a violation
in the first place, the Supreme Court adopted a more flexible
approach in Pearson.  As the Court explained, "[b]ecause the
two-step Saucier procedure is often, but not always,
advantageous, the judges of the district courts and the courts of
appeals are in the best position to determine the order of
decisionmaking will best facilitate the fair and efficient
disposition of each case." Pearson, 2009 WL 128768, at *13.

clearly established, or, in other words, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (internal quotations and citations omitted). The inquiry into whether a right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (citation omitted).

        2.   Was There a Deprivation of a Constitutional Right?

The Court first addresses whether the evidence, when construed in the light most favorable to Plaintiff, raises a jury question as to whether Defendant DeCosmo violated Plaintiff's Fourth Amendment rights.[6]  The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV.  "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999).  As the Court of Appeals observed in Abraham, Plaintiff "obviously was 'seized' when shot," and so the constitutional question boils down to whether or not the seizure was reasonable. Id.

_____

[6]  Plaintiff has also alleged that DeCosmo violated his rights under the Fourteenth Amendment.  As the Court explains below, Plaintiff has failed to state a cognizable Fourteenth Amendment claim.  This analysis of qualified immunity accordingly accounts only for Plaintiff's Fourth Amendment claim.

13

In excessive force cases, the reasonableness of an officer's use of force "should be assessed in light of the totality of the circumstances," id. (citation omitted), with the ultimate question being "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." Graham v. Connor, 490 U.S. 386, 397 (1989).  Among the factors that the Court should consider in determining whether a particular use of force was reasonable are the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Abraham, 183 F.3d at 289 (quoting Graham, 490 U.S. at 396).  "The Supreme Court further has counseled that it is reasonable for a law enforcement officer to use [potentially] deadly force if an objectively reasonable officer in the same circumstances would conclude that the suspect posed a threat of death or serious physical injury to the officer or to others," Marion v. City of Corydon, Indiana, 559 F.3d 700, 705 (7th Cir. 2009), and "if, where feasible, some warning has been given."  Tennessee v. Garner, 471 U.S. 1, 11-12 (1985).  At all events, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving –

14

about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

Applying this authority to the facts presented, the Court concludes, under the first step of the qualified immunity inquiry, that triable issues of fact exist as to whether Officer DeCosmo violated Plaintiff's Fourth Amendment rights.  While Defendants' telling of the facts suggests that DeCosmo had reason to view Plaintiff as an armed and dangerous suspect who was "attempting to evade arrest by flight," and who, DeCosmo believed, posed "an immediate threat to the safety of the officer" at the moment Plaintiff's arm allegedly moved up from his waist, Graham, 490 U.S. at 396, Plaintiff's version of the facts tells a different story.  According to Plaintiff's version of the facts, Plaintiff was not attempting to flee or evade arrest, but was instead simply following his sister to the Vaughn residence to discuss that evening's events with his sister.  (R. Brittingham Dep. at 59, 69.)  Should the jury credit Plaintiff's testimony that no officer ordered him to stop or spoke to him in any way as he was walking to the Vaughn residence, (id. at 61), the objective reasonableness of Officer DeCosmo's view that Plaintiff was attempting to flee would be cast seriously in doubt.  See Garner, 471 U.S. at 11-12.  That is, although Defendants rely in part upon Plaintiff's alleged flight in defending the objective reasonableness of Officer DeCosmo's

15

actions, cf. Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (while "not necessarily indicative or wrongdoing, . . . [flight] is certainly suggestive of such"), the facts surrounding Plaintiff's alleged flight are in dispute, raising a question of fact for the jury.  See Cowan ex rel. Estate of Cooper v. Breen, 352 F.3d 756, 762 (2d Cir. 2003) ("Although [DeCosmo] purports to rely only on the undisputed evidence in demonstrating that there was no constitutional violation of [Plaintiff's] rights, his brief . . . is replete with his own versions of the events") (internal quotations and citations omitted).

     Likewise, the testimony of Plaintiff, Derenda Brittingham, and Amirah Cotton, if credited by the jury, undermines Officer DeCosmo's argument that it was objectively reasonable for him to have believed that Plaintiff posed "an immediate threat to the safety of the officer" in the moments preceding the shooting. Graham, 490 U.S. at 396.  Although hotly disputed by Defendants, these witnesses' testimony is essentially that Officer DeCosmo shot Plaintiff immediately upon entering the apartment, without ordering Plaintiff to "freeze" or to put his hands in the air, giving Plaintiff "no opportunity to comply with [DeCosmo's] wishes before firing . . ."  Casey v. City of Federal Heights, 509 F.3d 1278, 1285 (10th Cir. 2007).  According to Plaintiff's evidence, DeCosmo could not reasonably have felt threatened by the alleged upward movement of Plaintiff's arm, because according

to Plaintiff, Derenda Brittingham, and Amirah Cotton, such an upward motion did not in fact take place – rather, according to Plaintiff's evidence, DeCosmo burst through the door and shot Plaintiff instantaneously.  The critical facts for the Fourth Amendment issue in this case – "whether at the moment [DeCosmo] decided to fire at [Plaintiff], he reasonably believed that . . . his life or person [was] in danger," Cowan, 352 F.3d at 762 – are thus in dispute, and are not subject to resolution upon summary judgment.  See Abraham, 183 F.3d at 290.

Moreover, Plaintiffs' evidence indicates that no officer ordered Plaintiff to stop or otherwise warned him of the imminent use of force.  According to Plaintiff, no officer spoke to him when he was walking on Phillip Street to the Vaughn residence, (R. Brittingham Dep. at 61), and Plaintiff, Derenda Brittingham, and Amirah Cotton all testified that Officer DeCosmo shot Plaintiff without warning immediately upon bursting into the apartment.  (Id. at 76; D. Brittingham Dep. at 35; Cotton Dep. at 35.)  The Supreme Court has made clear that, where feasible, a warning must be issued prior to the use of potentially deadly force.  See, e.g., Garner, 471 U.S. at 11-12.  While Defendants assert that multiple warnings were given, in Plaintiff's version of the facts, which the Court must credit at this stage of the litigation, Scott, 550 U.S. at 378, no warnings were given, further undermining the reasonableness of DeCosmo's use of force.

17

Defendants argue that Plaintiff's version of the facts is implausible, citing in particular Plaintiff's suggestion that Officer DeCosmo "simply burst into the house w[h]ere plaintiff was located and randomly shot him in front of a roomful of witnesses." (Defs.' Reply Br. at 2.)  Implausible or not, this is the testimony of three witnesses to the events in question. As the Court of Appeals emphasized in a qualified immunity/excessive force case, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Abraham, 183 F.3d at 290 (quoting Anderson, 477 U.S. at 249).[7]  In this case, the question of whether Officer DeCosmo employed a "shoot first, ask questions later" approach is one for the jury, not the Court.

In summary, the Court concludes, under the first step of the qualified immunity inquiry, that triable issues of fact exist with regard to the question of whether DeCosmo's "actions . . .

---

[7]  As the Court of Appeals has further explained:

[R]easonableness under the Fourth Amendment should frequently remain a question for the jury.  To put the matter more directly, since we lack a clearly defined rule for declaring when conduct is unreasonable in a specific context, we rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of "reasonableness" is itself reasonable and widely shared.

Abraham, 183 F.3d at 289-90.

[were] 'objectively reasonable' in light of the facts and circumstances confronting [him] . . ." Graham, 490 U.S. at 397. The Court thus proceeds to the second step of the qualified immunity analysis to assess whether, under Plaintiff's version of the facts, DeCosmo can be found to have "made a reasonable mistake about the legal constraints on his actions." Curley, 499 F.3d at 206-07.

### 3.  Was the Right Clearly Established?

In evaluating whether the right in question was clearly established at the second step of the qualified immunity inquiry, the Court must assess whether the officer "reasonably misapprehend[ed] the law governing the circumstances [he] confronted." Brosseau, 543 U.S. at 198.  That is, if the officer's conduct fell within the "hazy border between excessive and acceptable force," then "the officer should not be subject to liability or, indeed, even the burdens of litigation." Id. (citations omitted).  In determining whether the right the officer allegedly violated was clearly established, the Supreme Court has stated:

> [T]here is no doubt that Graham v. Connor . . . clearly
> establishes the general proposition that use of force is
> contrary to the Fourth Amendment if it is excessive under
> objective standards of reasonableness.  Yet that is not
> enough.  Rather, . . . the right the official is alleged
> to have violated must have been "clearly established" in
> a more particularized, and hence more relevant, sense:
> The contours of the right must be sufficiently clear that
> a reasonable official would understand that what he is
> doing violates that right.

19

Saucier, 533 U.S. at 201-02 (internal quotations and citations omitted).

In this case, the very factual questions which foreclosed a determination as a matter of law that Officer DeCosmo's use of force upon Plaintiff was objectively reasonable, supra, likewise make summary judgment inappropriate on the issue of whether the right in question was clearly established. See Cowan, 352 F.3d at 764. In particular, at the time these events took place and under the circumstances presented here, a reasonable officer would, at minimum, have understood that he was required to issue a warning before using potentially deadly force upon a suspect. See, e.g., Ridgeway v. City of Woolwich Tp. Police Dept., 924 F. Supp. 653, 659 (D.N.J. 1996) ("[Tennessee v. ]Garner requires the officer using deadly force to give a warning 'where feasible'") (citing numerous cases so holding); Casey, 509 F.3d at 1285; Craighead v. Lee, 399 F.3d 954, 962 (8th Cir. 2005); Vathekan v. Prince George's County, 154 F.3d 173, 179-80 (4th Cir. 1998) ("it is settled that if no warning was given at this point, [the officer's] actions were objectively unreasonable").

Plaintiff's evidence indicates that no officer spoke to him before he entered the Vaughn residence (at a time when the jury could easily conclude that conveying a warning and an order to stop were feasible), (R. Brittingham Dep. at 61), and that Officer DeCosmo shot Plaintiff without warning the "instant" he

entered the apartment.  (Id. at 76; D. Brittingham Dep. at 35; Cotton Dep. at 35.)  Thus, "here, . . . we have a victim and [two] civilian witness[es] ready to testify that they heard no warning, contradicting the account of [DeCosmo] and the other officers."  Vathekan, 154 F.3d at 180 (also explaining that "[a] juror could reasonably conclude that if certain witnesses did not hear a warning, then no warning was given, even if other witnesses testify to a warning") (emphasis in original); see also Craighead, 399 F.3d at 962 ("The facts we are required to assume show that a warning was feasible but not given.").

The Court concludes that a reasonable officer in DeCosmo's position would have understood that shooting Plaintiff under the circumstances presented by Plaintiff's version of the facts without giving a warning prior to the use of potentially deadly force clearly runs afoul of the Fourth Amendment.  See Casey, 509 F.3d at 1285; Craighead, 399 F.3d at 962; Vathekan, 154 F.3d at 179-80; Ridgeway, 924 F. Supp. at 659.  The Court likewise concludes that disputed questions of fact exist as to whether DeCosmo issued any warnings to Plaintiff prior to shooting him. Because "[a] decision as to qualified immunity is premature when there are unresolved disputes of historical facts relevant to the immunity analysis," Phillips v. County of Allegheny, 515 F.3d 224, 242 n.7 (3d Cir. 2008) (internal quotations and citations omitted), the Court will deny Defendant DeCosmo's motion for

summary judgment as to Plaintiff's excessive force claim.

###    C.   Equal Protection Claim

Defendants argue, and the Court agrees, that they are entitled to summary judgment as to Plaintiff's Fourteenth Amendment Equal Protection claim.  "The Equal Protection Clause 'prohibits selective enforcement of the law based on considerations such as race.'"  Thomas v. Independence Twp., 463 F.3d 285, 297 (3d Cir. 2006) (citing Whren v. United States, 517 U.S. 806, 813 (1996)).  To make out an equal protection claim, a plaintiff must prove that the actions of the law enforcement officials "(1) had a discriminatory effect and (2) were motivated by a discriminatory purpose."  Bradley v. United States, 299 F.3d 197, 206 (3d Cir. 2002) (citing Arlington Heights v. Metro Housing Dev. Corp., 429 U.S. 252, 264-66 (1977)).  "To prove discriminatory effect, [the plaintiff must] show that she is a member of a protected class and she was treated differently from similarly situated individuals in an unprotected class."  Id.

Plaintiff, who is black, has offered no evidence to suggest that similarly situated individuals in an unprotected class were treated more favorably than he was.  Indeed, Plaintiff has not attempted to respond to Defendants' motion for summary judgment as to his equal protection claim.  Because there is no evidence in the record from which the jury could reasonably find that Plaintiff "was treated differently from similarly situated

individuals in an unprotected class," id., the Court will grant
Defendants' motion for summary judgment as to Plaintiff's equal
protection claim.

> **D.  Fourth Amendment Claim Against the Camden County
>      Prosecutor's Office**

Defendants argue, and the Court agrees, that the Camden
County Prosecutor's Office is entitled to summary judgment as to
Plaintiff's Fourth Amendment claim.  It is well-settled that "[a]
municipality cannot be responsible for damages under section 1983
on a vicarious liability theory, Monell v. Dept. of Soc. Servs.,
New York City, 436 U.S. 658, 694-95 (1978), and 'can be found
liable under § 1983 only where the municipality itself causes the
constitutional violation at issue.'  City of Canton v. Harris,
489 U.S. 378, 385 (1989)."  Carswell v. Borough of Homestead, 381
F.3d 235, 244 (3d Cir. 2004).  In order to demonstrate that a
municipal entity is responsible for a constitutional violation, a
plaintiff "must demonstrate that the [alleged] violation of his
rights was caused by either a policy or a custom of the
municipality."  Berg v. County of Allegheny, 219 F.3d 261, 275
(citation omitted).

In this case, Plaintiff has adduced no evidence indicating
that such a policy or custom existed.  There is nothing in the
record suggesting that a decisionmaker with final authority
"issued an official statement of policy" directing officers like
DeCosmo to use excessive force.  Jiminez v. All American

23

Rathskeller, Inc., 503 F.3d 247, 250 (3d Cir. 2007).  Likewise,
although the Complaint alleges that the CCPO failed to train or
discipline its employees, Plaintiff has identified no evidence
from which a jury could reasonably conclude that such a custom
existed – there is no evidence in the record to suggest, for
example, "continued official tolerance of repeated misconduct,"
Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990), or a
pattern of conducting inadequate investigations into police
shootings.  See Beck v. City of Pittsburgh, 89 F.3d 966, 975 (3d
Cir. 1996).

In summary, finding that Plaintiff has failed to adduce
evidence in support of his Fourth Amendment claim against the
CCPO, the Court will grant the CCPO's motion for summary judgment
as to Plaintiff's Fourth Amendment claim.

**E.   State Law Claims**

Finally, the Court addresses Defendants' argument that they
are immune from Plaintiff's state law claims pursuant to the New
Jersey Tort Claims Act ("NJTCA").  Defendant DeCosmo first argues
that he is immune from Plaintiff's assault and battery claim
pursuant to the NJTCA's provision of immunity to "[a] public
employee . . . [who] acts in good faith in the execution or
enforcement of any law."  N.J.S.A. 59:3-3.  The Court will deny
this aspect of Defendants' motion for summary judgment.  "The New
Jersey Supreme Court established that '[t]he same standard of

24

objective reasonableness that applies in § 1983 actions also governs questions of good faith arising under the Tort Claims Act.'" <u>Jimenez v. New Jersey</u>, 245 F. Supp. 2d 584, 588 (D.N.J. 2003) (quoting <u>Wildoner v. Borough of Ramsey</u>, 744 A.2d 1146, 1153 (2000)). As the Court explained, <u>supra</u>, questions of fact foreclose a determination that it was objectively reasonable for DeCosmo to have shot Plaintiff.

> [B]ecause the same "objective reasonableness" standard that is used to determine whether a defendant enjoys qualified immunity from actions brought pursuant to 42 U.S.C. § 1983 is used to determine questions of good faith arising under N.J.S.A. § 59:3-3, the same uncertainty that prevents the Court from determining as a matter of law whether defendant[] enjoy[s] qualified immunity with regard to [Plaintiff's] § 1983 claim also prevents the Court from determining as a matter of law whether the NJTCA shields [DeCosmo] from liability for allegedly assaulting [Plaintiff].

<u>Matos v. City of Camden</u>, No. 06-205, 2009 WL 737101, at *8 (D.N.J. Mar. 18, 2009). Since DeCosmo's qualified immunity and good faith immunity defenses rise or fall on the same "objective reasonableness" standard, the Court will deny DeCosmo's motion for summary judgment as to Plaintiff's assault and battery claim based on his good faith immunity defense.

As to the CCPO, however, the Court agrees with Defendants that Plaintiff's claim for assault and battery may not be asserted against governmental entities. As this Court recently explained:

> [T]here is no legal basis for permitting respondeat superior liability to public entities on the theor[y] of

25

> [assault and] battery . . ., which are acts that require
> "actual malicious or willful misconduct."   Section
> 59:2-10 of the Tort Claims Act precludes entity liability
> for such conduct . . .

Ward v. Barnes, 545 F. Supp. 2d 400, 420-21 (D.N.J. 2008).  The

Court will thus grant the CCPO's motion for summary judgment as

to Plaintiff's assault and battery claim.

    Lastly, Defendants argue that they are immune from

Plaintiff's state law claims pursuant to N.J.S.A. 59:5-2, which

provides public entities and employees with so-called "pursuit

immunity."

> The NJTCA provides absolute immunity to a public employee
> for "any injury caused by . . . a person resisting arrest
> or evading arrest" or "any injury resulting from or
> caused by a law enforcement officer's pursuit of a
> person." N.J. Stat. Ann. 59:5-2(b),(c).  Only a finding
> that the officer engaged in "willful misconduct"
> abrogates that immunity.  See Tice v. Cramer, 627 A.2d
> 1090, 1105 (1993).

Lamont v. New Jersey, No. 04-2476, 2009 WL 483899, at *9 (D.N.J.

Feb. 25, 2009).  While "willful misconduct" is not defined in the

statute, "the New Jersey Supreme Court, in Fielder v. Stonack,

141 N.J. 101[, 124] (1995), noted that '[p]rior decisions have

suggested that willful misconduct is the equivalent of reckless

disregard for safety, and is more than an absence of good

faith.'"  Antoine v. Rucker, No. 03-3738, 2007 WL 1462401, at *6

(D.N.J. May 14, 2007) (emphasis added).

    Based upon the record before it, the Court cannot conclude

that N.J.S.A. 59:5-2 shields Defendant DeCosmo from liability for

26

Plaintiff's assault and battery claim.  As the Court's qualified immunity discussion above makes clear, should the jury credit Plaintiff's evidence, it could conclude that DeCosmo exhibited a "reckless disregard for safety," id., by bursting into the apartment and shooting Plaintiff instantaneously without issuing a warning or giving Plaintiff the opportunity to comply with his wishes.[8]  As to Plaintiff's assault and battery claim, the Court will thus deny DeCosmo's motion for summary judgment.

However, Defendants are correct that N.J.S.A. 59:5-2 provides them with immunity from Plaintiff's negligence claim, because if Plaintiff's injuries were merely the product of DeCosmo's negligence in pursuing and arresting Plaintiff, then it cannot be said that Defendants exhibited a "reckless disregard for safety."  Id. (emphasis added).  The Court will accordingly grant Defendants' motion for summary judgment as to Plaintiff's negligence claim.

## IV.   CONCLUSION

For the reasons explained above, the Court will grant in part and deny in part Defendants' motion for summary judgment.

---

[8]  Of course, if the jury credits Defendants' evidence and concludes that DeCosmo did not evidence a reckless disregard for safety, then the NJTCA would ultimately immunize DeCosmo from liability.  As the Court emphasized above, upon summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.  Such a genuine issue exists here.

The Court will deny Defendant DeCosmo's motion for summary judgment as to Plaintiff's Fourth Amendment and assault and battery claims, but will grant his motion for summary judgment as to Plaintiff's Fourteenth Amendment and negligence claims.  The Court will grant the municipal Defendants' motion for summary judgment as to the entirety of Plaintiff's claims.  The accompanying Order is entered.


**May 18, 2009**                           **s/ Jerome B. Simandle**
Date                                        JEROME B. SIMANDLE
                                            United States District Judge


28